Charles **WATKINS** et al., Plaintiffs,

*v.*

**UNITED STEEL WORKERS OF AMERICO, AFL-CIO, LOCAL NO. 2369, et al., Defendants.**

**Civ. A. No. 70-1410.**

United States District Court,
E. D. Louisiana.

Jan. 14, 1974.

Richard B. Sobol, Elie, Sobol, Strickler & Dennis, New Orleans, La., for plaintiff-intervenor.

John C. Falkenberry, Cooper, Mitch & Crawford, Birmingham, Ala., for United Steel Workers of America.

Michael J. Warner, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for defendant, Continental Can Co.

CASSIBRY, District Judge:

This matter is before the Court on plaintiffs' and plaintiff-intervenor's Motion for Partial Summary Judgment. Upon consideration of the undisputed facts, the applicable authorities, and the arguments of all parties, it is the decision of the Court that the movants are entitled to the relief sought, and the Motion for Partial Summary Judgment is granted. The Court holds, on the particular facts of this case, that the defendants' layoff and recall practices discriminate on grounds of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2, and in violation of Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### I.

The defendant Continental Can Company (hereinafter "the Company") operated a plant for the manufacture of metal cans in Harvey, Louisiana. Defendant United Steel Workers of America, AFL–CIO, Local No. 2369 (hereinafter "the Union"), represents the hourly employees at this facility. The plaintiffs and plaintiff-intervenor are all either employees of the Company, presently laid off under the layoff and recall procedures utilized by the defendants, or, so it is alleged, discharged for racially discriminatory reasons.

The Company's plant in Harvey has been in operation for many years, but, with the exception of two blacks who were hired during World War II, only whites were hired at this plant until 1965. At the end of 1966, there were three black employees—including the

original two—out of 410 hourly employees. The Company began hiring some black workers in 1967 and 1968, and hired blacks to a substantial degree in the years 1969, 1970 and 1971. At one point in 1971 there were, according to the Company, over 50 blacks among a total of 400 hourly employees.[1]

Beginning in 1971 and continuing through this year, there has been a substantial cutback in employment at the Harvey plant. By April of 1973 there remained only 152 hourly employees. Pursuant to the terms of the collective bargaining agreement between the defendants, when there is to be a cutback in employment, layoffs are made on the basis of total employment seniority; the last man to be hired is the first to be laid-off. Laid-off employees are placed on a recall list and are reemployed, as needed, in the reverse order of the layoffs—i. e., the most senior employee on recall is the first to be reemployed.

These contract provisions were followed in making the layoffs at the Harvey plant. These layoffs have reached back to employees who were hired as early as 1951. As a necessary result, all of the black employees hired after 1965 were laid-off, and the Company's present work force is all-white, apart from the two blacks hired in the 1940's. Moreover, the first 138 persons on the recall list are white.[2] Accordingly, if the recall procedures established by the contract were valid, the Company could not be expected to employ another black man for many years.

## II.

Essentially, it is movants' argument that it was racially discriminatory to use length of service as a standard for determining which employees should be laid off because blacks were prevented, by the Company's white-only hiring policy, from acquiring long years of service.[3] Movants ask that the defendants be required to select employees for layoff on a basis that does not incorporate and perpetuate the effects of the Company's racial discrimination in hiring.[4] As far as I have been able to

---

1. This number includes some probationary employees that never achieved regular status, as the current combination seniority and recall list shows only fifteen blacks—two incumbents and thirteen on recall.

2. There is a total of 172 names on the recall list. There are thirteen blacks among positions 139 to 172. Plaintiff John Davis, Jr. is one of these thirteen.

3. It is not contended that the seniority system was adopted with discriminatory intent, but the intent of the employer is not a relevant consideration where an objective employment practice is challenged as discriminatory under Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) ; United States v. Local 189, 416 F.2d 980, 988 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). The governing standard against which to measure the defendants' seniority practices has been set out by the Fifth Circuit as follows :

   The *only* justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that such standards or procedures arise from a non-discriminatory legitimate business necessity.

Rowe v. General Motors Corp., 457 F.2d 348, 354 (5th Cir. 1972) (emphasis in original).

4. The Company has, for purposes of this Motion, conceded racial discrimination in hiring through 1962. There was no hiring in 1963 or 1964. In 1965, two blacks were hired out of 116. There were no regular hires in 1966.

   According to figures adduced by the Company, 27% of the workforce in the New Orleans Metropolitan area is black. As the Company has not effectively rebutted the undisputed statistical showing for 1965, an inference of discrimination in hiring in that year could easily be drawn. See Rowe v. General Motors Corp., 457 F.2d 348, 356 (5th Cir. 1972) ; United States v. Jacksonville Terminal Co., 451 F.2d 418, 450 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S. Ct. 1607, 31 L.Ed.2d 815 (1972). What is important, however, is not whether there was discrimination in hiring in any particular year, but that there is conceded discrimination to a date long after the employment of whites who have not been laid off. Title VII prohibits practices that perpetuate the effects of past discrimination, including discrimination that occurred before the effective date of the Act. See, e. g., United States v. Jacksonville Terminal Co., supra,

discover, this is the first time that a federal court has been asked to determine that layoffs and recalls based on plant seniority are racially discriminatory because of past hiring discrimination against blacks. But an argument to that effect draws strong support from two lines of related cases.

■ In one series of cases the courts have considered the legality of departmental or job seniority systems in the context of industrial plants that formerly maintained segregated work forces. Typically, black employees had been limited to a few low paying jobs in separate departments or lines of progression. During the 1960's, the segregation policy was abandoned, and black employees were permitted to transfer to formerly all-white departments or lines of progression. But after blacks made these transfers, they were faced with departmental or job seniority systems that gave them no credit for their prior service in other jobs or other departments, and which placed them at the bottom of the formerly all-white seniority roster. Uniformly, these seniority systems have been held racially discriminatory on the ground that employment preferences cannot be allocated on the basis of length of service in jobs or departments from which blacks had been excluded. *See, e. g.,* United States v. Local 189, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926 (1970); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U. S. 906, 92 S.Ct. 1607 (1972); Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971); United States v. Bethlehem Steel Corp., 446 F.2d 652, 657–659 (2d Cir. 1971); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968).

> "Full enjoyment of Title VII rights sometimes requires that the court remedy the present effects of past discrimination. . . . This includes both redressing the continuing effects of discriminatory seniority systems . . . and affirmative action to alter a seniority system which is not discriminatory on its face. If the present seniority system in fact operates to lock in the effects of past discrimination, it is subject to judicial alteration under Title VII."

United States v. Georgia Power Co., *supra*, 474 F.2d at 927. *See also* Griggs v.

---

451 F.2d at 450; *United States v. Local 189,* 416 F.2d 980, 983 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926 (1970); *United States v. Sheet Metal Workers,* 416 F.2d 123, 127, 132 (8th Cir. 1969). Moreover, with respect to 42 U.S.C. § 1981, the hiring discrimination is post-Act and at least partially within the ten-year governing limitation period. See *Boudreaux v. Baton Rouge Marine Contr.,* 437 F.2d 1011, 1017, n. 16 (5th Cir. 1971).

In view of some ambiguous language in the Company's brief, however a further comment on this point is appropriate. In that brief, the Company averred that it had not made an investigation of whether there is evidence to refute the inference of discrimination arising from the plaintiff's statistics regarding the composition of the Company's workforce prior to 1963. With regard to that time period, it stated its position as follows:

> Accordingly, the Company—solely for purposes of the issue raised in the current motion—is willing to assume that it maintained policies prior to 1963 which discriminated against blacks in hiring.

> 2. The Company reserves the right, however, to submit evidence to refute the pre-1963 inference of hiring discrimination if it becomes relevant to any other issue, including any remedy which might be ordered if this motion is granted.

Whatever the intended effect of this language, I have concluded that it does not operate to create a disputed issue of fact that would make summary judgment for plaintiff at this time inappropriate. The plaintiff's presentation revealed a significant statistical disparity between the percentage of blacks in the workforce and on the Company's employment roster. At that point the defendant was obliged to explain away that showing or else to have an inference of discrimination drawn against it. It was not permissible, by way of a footnote in a brief, to seek to defer that determination until a later day. I find that the plaintiff has sustained his burden of proving discrimination by the Company prior to 1963; and that it is no longer open to the defendant to contest that determination.

Duke Power Co., 401 U.S. 424, 429–430, 91 S.Ct. 849 (1971).

In these cases, where the affected class was composed of long standing—but previously segregated—black employees, the defendants were ordered to adopt a seniority standard based on total length of service. Plant seniority was held to be a racially neutral standard in those cases, not because it is *per se* valid, but because blacks had not been excluded from the plant (as distinct from certain departments or jobs) and thus had been able to earn plant seniority. *See* United States v. Local 189, 282 F. Supp. 39, 45 (E.D.La. 1968).

The other related line of cases concerns work referral rules in previously all-white craft unions. *See, e. g.*, United States v. Sheet Metal Workers, 416 F.2d 123 (8th Cir. 1969); Dobbins v. Electrical Workers Local 212, 292 F.Supp. 413 (S.D.Ohio 1968); EEOC v. Plumbers Local 189, 311 F.Supp. 468 (S.D.Ohio 1970), *vacated on other grounds*, 438 F. 2d 408 (6th Cir. 1971). In the construction trades, bargaining contracts require contractors to employ craftsmen who are referred by the union. In each of the cited cases, there was a history of exclusion of blacks from craft work under the contract. When the unions began admitting blacks, they continued to apply their longstanding referral rules, which granted priorities to those with long work experience and particularly to those with experience under the contract. As a result of their prior exclusion, blacks found themselves in the lowest group for purposes of referral. In all of these cases, the referral systems were held unlawful under Title VII, on the grounds that they perpetuated the effect of past discrimination against blacks, and presently deprived blacks of equal employment opportunity.

". . . Negroes qualified to do the work customarily performed by a journeyman electrician are deprived of an opportunity to be placed in a priority group in which they would have a reasonable opportunity to make a living. And they are so deprived because they were denied the opportunity to gain experience under the collective bargaining agreement or in the industry before the Act was passed."

United States v. Sheet Metal Workers, *supra,* 416 F.2d at 131. *See also* Dobbins v. Electrical Workers Local 212, *supra,* 292 F.Supp. at 446; EEOC v. Plumbers Local 189, *supra,* 311 F.Supp. at 475–478.

■■ These two sets of cases share a single principle: employment preferences cannot be allocated on the basis of length of service or seniority, where blacks were, by virtue of prior discrimination, prevented from accumulating relevant seniority. And this principle applies to invalidate the layoff and recall rules in the case at bar. The Company's history of racial discrimination in hiring makes it impossible now for blacks (other than the original two) to have sufficient seniority to withstand layoff. In this situation, the selection of employees for layoff on the basis of seniority unlawfully perpetuates the effects of past discrimination.

Although the exact question presented here has not previously arisen, two recent cases in this Circuit confirm that the principles of the segregated plant cases and craft union referral cases apply with equal force to restrict reliance on seniority by employers who formerly discriminated against blacks in hiring. Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Allen v. City of Mobile, 331 F.Supp. 1134 (S.D.Ala. 1971); *aff'd per curiam,* 466 F.2d 122 (5th Cir. 1972).

In Rowe v. General Motors Corp., plaintiffs challenged the Company's promotion practices on the basis of statistical evidence that showed that whites received a disproportionate number of the promotions from hourly to salaried jobs. The Company attempted to defend against this statistical showing by proving that blacks were not employed into hourly jobs until 1962, and that, because of their relative low seniority, they suffered a disproportionate incidence of

layoffs in the years that followed. From this, the Company argued that the advantage of whites in promotions was not discriminatory, but reflected their greater opportunity to accumulate the experience necessary for promotion.

The Court of Appeals rejected this attempted justification.

> [T]he disadvantage suffered by the Blacks hired after 1962 in lay-offs and rehiring is the direct result of the prior segregated policy. This is to make Blacks continue to suffer long after 1965, the effect of race discrimination long after Congress has forbidden it either in current application or as some sort of reincarnation of days gone by. . . . [The Company could not] treat the recently hired and governmentally twice emancipated Blacks as persons who once again had to go to the foot of the line.

> Akin to this is the contention that 'experience' was essential and only the long-employed Whites—and conversely, not the recently hired Blacks—had the 'experience'. Without gainsaying . . . that *qualifications* are an employer's prerogative, the standards cannot be automatically applied to freeze out newly freed Blacks because for the years of its segregated policy GM hired no Blacks to afford them an opportunity to acquire experience.

Rowe v. General Motors Corp., 457 F.2d 348, 358 (5th Cir. 1972).

Allen v. City of Mobile involved, in part, the promotion system in the Mobile Police Department. Candidates for promotion were awarded points based on length of service, so that 70 points were awarded for three years service, up to 100 points for eighteen years service. Judge Pittman found this system to be discriminatory because of prior hiring discrimination against blacks.

> "The first Negro officers were hired in 1954—17 years ago—so there are no black officers who have been on the force long enough to earn the maximum number of points. Additionally,

blacks for the first years were not hired in large numbers and the program at best was a token one. Therefore, many of the Negro officers on the force now could not join earlier and have not had the opportunity to earn seniority points.

> The court finds that the present seniority system constitutes racial discrimination against blacks." Allen v. City of Mobile, 331 F.Supp. 1134, 1142–43 (S.D.Ala. 1971).

The court ordered that the system be modified so that ten years seniority earned the maximum points on the scale. In affirming, the Court of Appeals adopted Judge Pittman's opinion. Allen v. City of Mobile, 466 F.2d 122 (5th Cir. 1972). In both *Rowe* and *Allen,* seniority was only one of several factors utilized by the defendant in allocating job opportunities, so that any discriminatory impact implicit in that standard was diluted. When, as here, however, seniority is the sole criterion for awarding employment opportunities it is more —not less—appropriate to interdict its discriminatory effects.

## III.

During the Senate consideration of the Civil Rights Act of 1964, Senator Clark, who was the floor manager of the equal employment title, inserted several memoranda into the Congressional record which state that Title VII would have no effect on established seniority rights. The following excerpts are typical of these statements:

> "Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by Title VII."

110 Cong.Rec. 7207 (April 8, 1964) (Department of Justice Memorandum, introduced by Senator Clark).

> "Seniority rights are in no way affected by the bill. If under a 'last

hired, first fired' agreement a Negro happens to be 'last hired' he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because of his race."

110 Cong.Rec. 7217 (April 8, 1964) (Questions and Answers prepared by Senator Clark). *See also* 110 Cong.Rec. 7212–15 (April 8, 1964) (Clark-Case Memorandum); 110 Cong.Rec. 6563–64 (March 30, 1964) (Sen. Kuchel).[5] It is the defendants' contention that these statements of intent foreclose the relief sought in the pending motion.

The Clark statements in the Senate certainly speak to the question before the court, and if they accurately defined the meaning of the statute, the defendants would prevail. I am convinced, however, in light of the subsequent amendments to the bill in the Congress, and the judicial decisions under the Act, that Title VII has a broader reach on questions of seniority.

Some weeks after Senator Clark inserted his memoranda in the Record, a bipartisan group of Senate leadership prepared another version of a Civil Rights Bill, including a new fair employment title, which on May 26, 1964 was introduced as a substitute for the original bill (110 Cong.Rec. 11930–34), and which was subsequently enacted. 110 Cong.Rec. 14511 (June 19, 1964). This version included, for the first time, language dealing directly with seniority. This language appears as Section 703 (h) of the Act, and provides as follows:

"[I]t shall not be an unlawful employment practice for an employer to apply . . . different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race. . . ." 42 U.S.C. § 2000e–2(h).

In view of this chronology, it seems proper to rely more heavily on the language of Section 703(h), and less on the earlier legislative statements than might otherwise be appropriate in interpreting the Act on questions of seniority.

In Quarles v. Philip Morris, Inc., *supra*, Judge Butzner interpreted Section 703(h) as follows:

"Section 703(h) expressly states the seniority system must be *bona fide*. The purpose of the act is to eliminate racial discrimination in covered employment. Obviously one characteristic of a *bona fide* seniority system must be lack of discrimination." 279 F.Supp. at 517.

This interpretation has been generally followed. *See e. g.,* United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 659. The defendants here cannot prevail under this standard: the seniority system at the Harvey plant is discriminatory for the same reason that department or job seniority systems in formerly segregated plants are discriminatory —because blacks were in the past denied access to the seniority unit, and were thereby prevented from accumulating relevant seniority.

In light of Section 703(h), the Courts have not accepted the Clark statements as reflecting the meaning of the Act as to seniority. Senator Clark stated that "seniority rights are in no way affected by the bill" (110 Cong.Rec. 7217), and that "Title VII would have no effect on seniority rights existing at the time it takes effect" (110 Cong.Rec. 7207). But there are innumerable cases under Title VII in which courts have significantly modified established seniority rights. And in many of these cases, the Clark statements were cited in defense of existing seniority systems, but the courts went ahead and altered seniority rights. See, *e. g.,* Quarles v. Philip Morris, Inc., *supra*, 279 F.Supp. at 515–

---

5. The relevant legislative materials in the Senate are set forth in Judge Butzner's opinion in Quarles v. Philip Morris, Inc., supra, 279 F.Supp. at 515–516. There is contrary legislative history on the House side, where an amendment to the bill to protect seniority rights was rejected. 110 Cong.Rec. 2728.

517; United States v. Local 189, supra, 416 F.2d at 987–988.

It is true that the case at bar involves the very factual situation that was used as an example of the generality in the Clark statements, while most of the decided cases involve situations that are technically different, but this distinction does not warrant a different result. Blanket statements were made to the effect that the bill would not have any effect on seniority. But upon consideration of the effects of seniority systems on the opportunities of black workers, where there is a backdrop of past discrimination, the Courts have enforced the general prohibition against racial discrimination set forth in Section 703, and ruled that the Act can have an effect on seniority. The greater similarity of the examples set forth in the Clark statements to the facts of this case does not alter the overriding reality that the statements themselves have been rejected as an interpretive guide.

The defendants maintain, however, that the Fifth Circuit's decision in United States v. Local 189, *supra,* compels a ruling here in their favor. That case involved the job seniority rules in a plant that was formerly segregated by race. On the basis of the Clark statements, the defendants argued that Title VII had no effect on existing seniority rights. The Court rejected this argument, stating that the Clark statements did not apply to formerly segregated plants, but only to plants that had not hired blacks at all. 416 F.2d at 987–988, 994–995. The defendants here rely strongly on these remarks of the Court of Appeals. But for several reasons, I have *respectfully* concluded that these remarks do not represent a judgment of the Court of Appeals on the question before me.

The question involved here was not before the Court of Appeals for decision in *Local 189.* No party argued that plant seniority was unlawful in formerly all-white plants. The Court's remarks were made without the benefit of adversary argument and were a readily available basis on which to distinguish legislative history that the defendants argued protected racial discrimination. In fact, in *Local 189,* the Court *declined* to follow the Clark statements and held that seniority rights *could* be modified under Title VII, where blacks had not had equal access to the seniority unit. That holding is more persuasive for this case, than are the dicta on which the defendants rely. It would certainly be difficult to rationalize an interpretation of the Act whereby companies and unions that maintained segregated plants would be required to alter seniority rules to afford blacks a fair opportunity to compete for formerly all-white jobs, but plants that totally excluded blacks would be permitted to apply seniority rules that foreclosed blacks from that same opportunity.

Moreover, the Equal Employment Opportunity Commission has expressly rejected the *Local 189 dicta* in a case in which the issue was squarely involved. EEOC Decision No. 71–1447 (March 18, 1971). There, the EEOC ruled that an employer who had refused to hire black workers in the years before 1964, could not now award promotions, as between whites and newly hired blacks, on the basis of plant seniority. In so holding, the EEOC "respectfully note[d] [its] disagreement" with the decision of the Court of Appeals in *Local 189.* CCH, EEOC Decisions 1973, ¶ 6217 at pp. 4375–76, and note 10.[6]

6. The defendants refer me to two EEOC Decisions, EEOC Decision No. 70–517, CCH EEOC Decisions ¶ 6134 (February 9, 1970) and EEOC Decision No. 71–484, CCH EEOC Decisions ¶ 6176 (November 16, 1970) in support of their position that the Commission has expressly held that layoffs in the order of plant seniority are valid. I believe, however, that the defendants misconstrue those cases.

EEOC Decision No. 70–517 did not involve a claim that a plant seniority system was discriminatory because of prior hiring practices. That case involved only the issue of whether a senior white who bumped a more junior black was qualified for the job at the

■■ In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court held that the interpretations of Title VII issued by the EEOC are "entitled to great deference" in the Courts. 401 U.S. at 433–434, 91 S.Ct. 849. Considering this mandate, and in light of the EEOC decision supporting the position of the movants here, I think that the question is, at the very least, not foreclosed by the *Local 189* opinion.[7]

■ One further word on the matter of legislative history. This action is grounded both on Title VII and on Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. It is now well established that Section 1981 confers a right of action against racial discrimination in employment. Sanders v. Dobbs House, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S. Ct. 935, 28 L.Ed.2d 231 (1971); Boudreaux v. Baton Rouge Marine Contr., 437 F.2d 1011 (5th Cir. 1971); Hill v. American Airlines, Inc., 479 F.2d 1057 (5th Cir. 1973); and this statute, which has been interpreted as a general prohibition against private discrimination in employment, is not restricted by any of the legislative history of Title VII, which was enacted ninety eight years later. *Cf.* Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); United States v. Muniz, 374 U.S. 150, 158, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The point is not simply that plaintiffs—having established racial discrimination—are entitled to prevail under the general standard of Section 1981, apart from the reach of Title VII on this question. Title VII and Section 1981 are generally enforced together in single proceedings. Although it is possible that an employment practice could be held lawful under one statute and unlawful under the other, it would clearly be an undesirable result to construct two separate bodies of substantive law for the enforcement of the two statutes.

---

time of the bump. The EEOC merely held that the white had the qualifications specified in the collective bargaining agreement. EEOC Decision No. 71–484 involved a plant which formerly segregated its employees by race, but did not refuse to hire blacks outright. The EEOC held that the Company could not use a system of seniority based on time in a particular craft, but must use plant seniority. This decision simply followed the many judicial decisions altering job or departmental seniority systems in formerly segregated plants.

In short, the novel issue involved in this case was not presented to the Commission for decision in either of the EEOC opinions referred to by the defendant: whether Title VII will permit companies and unions to employ a plant seniority system, where such a system inevitably will have a disproportionately adverse impact on blacks because of their prior exclusion from the plant. In neither decision did the plaintiff complain that prior refusals to hire blacks at all would put them, as a group, in an inferior position under a plant seniority system; and clearly absent such an allegation, the utilization of plant seniority could not possibly be of questionable validity.

7. Defendants also rely on Section 703(j) of the Act, which prohibits preferential treatment, but it is now settled that "the present correction of past discrimination is not preferential treatment." Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 250 (10th Cir. 1970).

The defendants have repeatedly characterized the issue in this case as being whether the black employees can be given more than their plant seniority in determining the order of layoff and recall in the Company's plant. With all deference, I do not believe that such a phrasing properly captures the essence of the plaintiff's position. The plaintiff here does not ask for some sort of "super seniority" that would entitle him and members of the class he represents to blanket preference over white incumbents to positions with the Company. Although I do not believe any absolute preference would be acceptable, *cf.* Carter v. Gallagher, 452 F. 2d 315, 327–332 (8th Cir. 1972), the plaintiff here instead questions the validity of seniority itself as a basis for allocating employment opportunities when the inevitable outcome of such a decision would be to perpetuate a past discrimination in favor of white employees. He suggests that a fairer alternative would be to ignore seniority and to award jobs on some basis that places the burden of the present adverse conditions on both blacks and whites in an aliquot fashion. I believe that a solution along such lines is fully in keeping with the remedial policies of Title VII. See Section V, infra.

The defendants' argument in this case based on legislative history cannot possibly restrict the application of Section 1981. This is a strong additional reason to reject their argument as a proper interpretation of Title VII.

## IV.

In the segregated plant cases, the blacks who were discriminated against were given inferior jobs and thereby were on hand to receive the benefits of the Court's remedial orders. Here, blacks were simply not hired, and as a result, the victims of the original discrimination cannot be identified. On the basis of this distinction, the defendants argue that the segregated plant cases do not provide authority for the relief sought by movants here.

But Title VII orders are not entered to right past wrongs or to compensate victims of pre-Act discrimination for their pre-Act injury. The orders in all of the cases involving seniority or referral rules are intended to prevent *present* discrimination. For example, in the segregated plant cases, relief was not entered to make whole the blacks who had been segregated before the passage of Title VII. Rather, it was designed to insure that, because there had been job segregation before the Act, blacks would not, for the next generation, continue to work in lower paying jobs than later-hired whites. Similarly, in this case, the relief ordered by the Court will not be designed to compensate the blacks who were not hired by the Company between 1945 and 1965. It will be designed to insure that, because the Company hired no blacks for twenty years, the plant will not operate without black employees for the next decade. The beneficiaries of the order will be the blacks who will now work at the Harvey plant, but who would otherwise have been excluded because of the structure built upon the prior discrimination.

It is not unusual for courts in Title VII cases to impose a remedy to enjoin the continued effects of past discrimination that, on an individual basis, benefits persons other than those who were victims of the original discrimination. For example, where it has been proved that an employer refused to hire blacks or that a union refused to admit blacks, the courts have established temporary quotas for hiring or referral of blacks at a rate higher than minority proportions of the work force. *See* Asbestos Workers, Local 53 v. McCarty, 407 F.2d 1047 (5th Cir. 1969); United States v. IBEW, Local 212, 472 F.2d 634 (6th Cir. 1973); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala. 1972); United States v. Lathers, Local 46, 471 F.2d 408 (2d Cir. 1973); Carter v. Gallagher, 452 F.2d 315, 327–332 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Because the quotas in these cases are preferential, black persons will be hired who would not have been hired under a normal fair employment standard; and it would be only coincidence if any of the blacks so hired were individuals previously excluded.

Similarly, affirmative action programs, imposed under Executive Order and approved by the courts, have precisely the same effect in conferring special opportunities for employment on individuals who were not themselves victims of discrimination. *See* Contractors Ass'n v. Schultz, 442 F.2d 159 (3d Cir.) cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L. Rev. 723, 759–60 (1972).

Finally, even in the segregated plant cases, all of the beneficiaries of the order are not persons who suffered from discrimination.

"The discrimination found illegal here was against a class of persons. It is true that some of the black employees in the Affected Class might not even under the best of systems have been initially assigned to [certain jobs that previously had been reserved to whites.] But there is no apparent way of knowing that or determining

now who they would be. A group remedy is therefore appropriate."
United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 560 (W.D.N.C. 1972). *Accord,* United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 660. *See also* United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 866 (5th Cir. 1966), *aff'd en banc,* 380 F.2d 385, *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). The courts have found it preferable to afford a class remedy rather than to tolerate the continued vestiges of discrimination.

## V.

Finally, there is the question of remedy. In their motion, movants ask the Court to defer the question of remedy, so that the parties will have an opportunity to confer on the matter, and possibly propose a joint remedy.

▮ With just a few comments on this issue, I intend to accept this suggestion. The remedy should involve the minimum alteration of existing industrial practices that is consistent with redressing the discrimination present here. Plant seniority and recall rights should not be eliminated, but should be modified only to the extent necessary to effect this end. Although the movants have not at this point asked the Court to fashion a remedy, they have set forth several proposals for relief. The best of these would involve the apportionment of layoffs among whites and blacks on the basis of the proportion of each group to the total workforce. Then the employees to be laid off could be selected within each racial group on the basis of plant seniority. On the matter of filling future vacancies, movants suggest that a one to one balance be struck between selection of names off the recall list and the employment of blacks.

Movants proposals would eliminate the racial discrimination and seem appropriate for the future.[8] But as a retroactive remedy for the 1971–73 layoffs, these proposals would impose a disproportionate burden on a handful of white incumbent employees. Traditionally, questions of new hiring are outside of the scope of an industrial union's jurisdiction, and as the Union here has persuasively argued, neither it nor its members contributed substantially to the Company's all-white hiring policy. For this reason, it seems appropriate that the Company, rather than a few white employees, should bear the primary burden of correcting the discrimination that has occurred since 1971.

One possibility is for the Company to reemploy the blacks who were laid off discriminatorily since 1971, and to utilize a larger work force, possibly with some reduction in working hours, until normal attrition reduces the work force to its most efficient level. Another possibility is a lump sum payment to the blacks on the recall list with priority rights to employment in the next openings. Undoubtedly the parties will consider additional alternatives, as well as the question of back pay. I simply wished to indicate that at this time I am disinclined toward any remedy for the 1971–73 layoffs which would cause the immediate displacement of any incumbent employee.

---

8. The seniority expectations of some white employees will undoubtedly be frustrated by these remedies.

But in the context of this case that possibility is not such an overriding business purpose that the relief requested must be denied. Assuming arguendo that the expectations of some employees will not be met, their hopes arise from an illegal system. Moreover, their seniority advantages are not indefeasibly vested rights but mere expectations derived from a bargaining agreement subject to modification.

Quarles v. Philip Morris, *supra,* 279 F. Supp. at 520. Cf. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).
United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 663. *See also* United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 312 (8th Cir. 1972); United States v. Local 189, *supra,* 416 F.2d at 989. The white employees, however, will fare no worse as a result of the proposed remedies than they would had the Company hired blacks on a fair basis throughout the years.

The parties are directed to confer regarding remedy within thirty days. At the end of this period, counsel for plaintiffs and counsel for plaintiff-intervenor shall submit a proposed decree, indicating whether there is consent of the other parties. If there is not, the defendants shall file their objections and counter-proposals within fifteen days, and thereafter the Court will set the matter for hearing.