Luttrell B. COX et al.,

v.

**ALLIED CHEMICAL CORPORATION, LOCAL 216, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO.**

Civ. A. No. 72–106.

United States District Court,
M. D. Louisiana.

Sept. 23, 1974.

**310**

Richard B. Sobol, David J. Dennis, New Orleans, La., for plaintiffs.

Victor A. Sachse, III, Breazeale, Sachse & Wilson, Baton Rouge, La., for Allied Chemical Corp.

James D. Thomas, II, Dodd, Hirsch, Barker, Avant & Wall, Baton Rouge, La., for Local 216, International Union of Operating Engineers, AFL–CIO.

E. GORDON WEST, District Judge:

This suit is brought by two former employees and one present employee of the defendant, Allied Chemical Corporation, alleging violations of the Civil Rights allegedly protected by the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The plaintiffs purportedly bring this action in their own behalf and as a class action on behalf of all other persons similarly situated pursuant to Rule 23 (a), (b)(2) and (3) of the Federal Rules of Civil Procedure. The plaintiffs, in essence, challenge the seniority system employed at the Allied Chemical plant, and seek damages and other appropriate relief for what they claim to be discriminatory transfer, promotion, and layoff practices employed by Allied and the union to which plaintiffs belong, Local 216, International Union of Operating Engineers, AFL–CIO.

The defendants contest the plaintiffs' right to maintain this suit as a class action, and also deny that they or either of them have or are engaging in any hiring, firing, transfer or promotion practices that are in any way discriminatory or contrary to law. After a full evidentiary hearing, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The defendant, Allied Chemical Corporation, is an employee in an industry affecting commerce, and the defendant, Local 216, International Union of Operating Engineers, AFL–CIO (hereinafter "Local 216") is a labor organization and the bargaining agent for the hourly employees at Allied's Plastics Division plant in Baton Rouge, Louisiana.

On January 17, 1966, Allied Chemical Corporation purchased the Baton Rouge Plastics Division plant from W. R. Grace & Company. At that time, and until August, 1971, the hourly employees at

the plant were divided into four "units": 1) Production, 2) Services, 3) Maintenance and 4) Stores. The racial composition of the Maintenance and Stores Units is presently and always has been white. That of the Services and Production Units is somewhat more complicated. It appears that when Allied Chemical Corporation purchased the plant in 1966 the Production Unit was all white and the Services Unit was all black. As a result of the collective bargaining agreement of December 15, 1967 between Allied and Local 216, a substantial number of blacks from the Services Unit transferred to the Production Unit as baggers. In 1971, as a result of a conciliation agreement with the Equal Employment Opportunity Commission, all of the jobs in the Services Unit were merged into the Production Unit, and the Services Unit was abolished. After the merger of these units the black employees who were formerly in the Services Unit were able to use their total plant seniority as their unit seniority in the Production Unit. In addition, the EEOC conciliation agreement and the present collective bargaining agreement provide that when a black employee hired on or before May 2, 1969 transfers from one seniority unit to another or within a seniority unit, he will compete with other employees on the basis of his total plant seniority, providing he has successfully completed a one-year residency requirement. At the present time, although the Production Unit is integrated, all of the Senior Operator and A Operator jobs are filled by whites, and all black employees of Allied work in the unit as baggers, truck drivers, janitors, and laborers. In the past there have been two black A Operators and one black trainee, who voluntarily returned to the B Operator (bagger) classification.

The Production and Maintenance Units at the plant subdivided into different job classifications. The jobs in the Production Unit are Senior Operator, A Operator, B Operator (bagger), C Operator (truck driver), D Operator (janitor), and E Operator (laborer).

The jobs in the Maintenance Unit are Senior Mechanic and Mechanic, which are both maintenance related craft jobs. The employees in the Production Department classified as Senior Operator and A Operator are paid salaries comparable to the Senior Mechanics and General Mechanics in the Maintenance Department. The other employees in the lower classifications of the Production Unit have no counterparts in the Maintenance Unit. The Stores Unit has the single job classification of Storeroom Clerk. The Storeroom Clerk receives a salary in an amount slightly less than that of a starting A Operator.

Under the terms of the present and all prior collective bargaining agreements between defendants, there is now and has been in effect at the Baton Rouge Plastics Divisions plant a "unit seniority" system. Therefore, seniority for the purposes of promotion, transfer, or lay-off is governed by the length of service within a particular unit. The plaintiffs contend that the discriminatory effects of this seniority system, and in particular its application in the case of lay-offs, is a violation of Title VII of the Civil Rights Act. Under the collective bargaining agreement, when a reduction in force in a particular unit is necessary, the employees in the jobs to be eliminated are allowed to displace the least senior employees within their job classification. The employees who are displaced from their job classification are in turn permitted to displace the least senior employees in the next lower classification. This procedure is followed until the least senior employees in the unit are laid off. The reduction in force in one unit takes place without regard to the seniority of the employees of the other units. So, the employees outside the unit suffering a reduction in force are not affected by the reduction in the other unit, regardless of whether they have less seniority than those employees to be laid off.

The defendants contend that the separation of units by a unit seniority system is justified because of the functional

difference in the departments and by the fact that the plant could not operate in a safe and efficient manner unless qualified maintenance personnel are allowed to hold positions in the Maintenance Unit. The evidence clearly establishes that work in the Maintenance Unit requires a certain amount of technical knowledge of highly complex machinery by employees with a mechanical aptitude in order to safely and efficiently perform the job as a mechanic and at the same time maintain a profitable on stream factor for the company. The testimony of Al Farris, Maintenance Supervisor, and Don Rosenberg, Plant Manager, establishes that the plant utilizes potentially dangerous chemicals, under conditions of heat, high temperature, and pressure to produce its product. In addition, the machinery is complex and must be properly maintained and repaired to meet a very close operational tolerance on the order of .001–.003 inches, and must be adjusted by the use of precision tools and instruments.

It is the Company's position that to achieve the necessary level of safety and proficiency, it would like to require that a prospective employee of the Maintenance Unit have at least three years industrial maintenance experience. However, the defendants have stipulated that several employees, although not a significant number of the force, entered the Maintenance Unit at a time (from late 1965 through 1968) when there was a tight labor market condition in Baton Rouge and personnel with sufficient industrial and educational experience were not available to fill maintenance positions. Maintenance employees hired during this period learned the requisite skills by working on the job with experienced mechanics.

On September 11, 1967, the plaintiff, Luttrell B. Cox, a negro, was employed by Allied Chemical Corporation as a B Operator in the Production Unit. On or about October 22, 1971, he was demoted to the position of janitor, as a result of the above described lay-off rules, and for that reason he resigned. The parties have stipulated that at the time Luttrell Cox was demoted, there were employees in the Maintenance and Stores Unit with less plant seniority. In addition, evidence supports the conclusion that he had acquired some maintenance related education and skills while serving in the Army.

Plaintiff, Lloyd R. Hinton, a negro, was employed by Allied in the Production Unit on December 2, 1968. According to the "Minority Employees" list contained in Joint Exhibit 4, Hinton was working as an A Operator on May 25, 1971. On October 22, 1971, he was laid off as a result of the above described lay-off rules. It is also stipulated that when Hinton was laid off there were employees with less plant seniority in the Maintenance and Stores Unit. Furthermore, the evidence clearly establishes that he had acquired maintenance related training and skills while in the Army.

Plaintiff, Sherwood Cox, white, has been employed by Allied in the Production Unit since January 20, 1966. He is presently employed as an A Operator in that Unit.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the claims of the three individual plaintiffs as claims arising under the Civil Rights Act of 1866, 42 U.S.C. § 1981, Sabala v. Western Gillette, Inc., 362 F.Supp. 1142 (S.D.Tex.1973). See also Caldwell v. National Brewing Co., 443 F.2d 1044 (CA 5–1971); Sanders v. Dobbs Houses Inc., 431 F.2d 1097 (CA 5–1970), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The defendants contend that plaintiffs have not met the jurisdictional requirements of Title VII in that "right to sue" letters had not been issued by the Equal Employment Opportunity Commission. The plaintiffs, on the other hand, point out that more than six months prior to instituting this action they filed a complaint with EEOC charging defendants with racial discrimination in violation of Title VII. However, the Commission was unable to

satisfactorily dispose of the plaintiffs' complaint, and, although specifically requested by counsel, failed to issue plaintiffs a "right to sue" letter, apparently because it had misplaced the charges which plaintiffs had filed. It is clearly established by the cases which have interpreted 42 U.S.C. § 2000e–5 that there are only two jurisdictional requirements for suit under Title VII: 1) The filing of a complaint with EEOC and 2) The receipt of the statutory notice of right to sue. See Beverly v. Lone Star Lead Const. Corp., 437 F.2d 1136 (CA 5–1971); Miller v. International Paper Co., 408 F.2d 283 (CA 5–1969); Dent v. St. Louis-San Francisco Ry. Co., 406 F.2d 399 (CA 5–1969). There is no question of plaintiffs' compliance with the first of these requirements. As to the second, this Court has previously held, while considering defendants' motion to dismiss, that under the circumstances of this case, EEOC could not prevent judicial determination of plaintiffs' complaint by refusing to give the required statutory notice of a right to sue. The basic purpose for imposing the duty upon an employee of seeking conciliation through the EEOC is "that voluntary compliance is preferable to court action and that efforts should be made to resolve these employment rights by conciliation both before and after court action." Dent v. St. Louis-San Francisco Ry. Co., supra, at 402. In the present case plaintiffs have done all that the statute requires in seeking conciliation of their claims. They should not be further barred from bringing suit because of actions by the EEOC which were beyond their control. "To bar a party from bringing a suit because the E.E.O.C. has shirked its statutory responsibility would indeed be to provide a hollow remedy and to inflict an undeserved penalty upon an innocent person." Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258 at p. 263.

The plaintiffs seek to have this suit maintained as a class action on behalf of a class of present and former employees in the Production Unit at the plant, pursuant to Rule 23(a), (b)(2) of the Federal Rules of Civil Procedure. That rule provides:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\*    \*    \*    \*    \*    \*

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole \*  \*  \*."

The plaintiffs contend that since the class is allegedly composed of all present and past employees of the Production Unit, both black and white, the class is so numerous that joinder of all members is impracticable, and that thus the requirement of Rule 23(a)(1) is met. However, this conclusion is not supported by the law or the evidence.

As to the white employees in the Production Unit, it seems clear that they can be members of a class in a Title VII suit if they can first show that they were adversely affected by the employer's or union's racially discriminatory practices. In United States v. Roadway Express, Inc., 457 F.2d 854 (CA 6–1972), the Court at page 856 stated:

"In seeking to deny such seniority to the transferred white city drivers, the appellants overlook the corollary fact that the white city drivers were equally the victims of discrimination, since

their transfer was prevented as a necessary part of the refusal to permit black city drivers to transfer to over-the-road jobs."

But, in the present case, there is no evidence showing that any or all of the white members of the Production Unit were adversely affected as a result of racial discrimination against blacks at the Allied plant. For example, the "Seniority List" of January 21, 1974 (Joint Exhibit 5) shows that of a total of 85 whites in the Production Unit, 76 work in Senior Operator of A Operator job classifications. These employees are paid a salary which is the same as that paid to the mechanics and senior mechanics in the Maintenance Unit. There is no indication that the other white employees are in the lower job classification for any reason other than the fact that they have not been employed long enough to accumulate seniority or they are not qualified to handle another job.

■ In addition, there is no evidence that any of the white employees of the Production Unit ever desired to transfer out of the Production Unit into another unit and were deprived of doing so because of discriminatory practices. In fact, Sherwood Cox, the white plaintiff who is allegedly the representative of these employees, did not even take the stand and there is nothing to indicate that he was qualified to handle maintenance related work. Therefore, the plaintiffs have failed to bear their burden of proving that any of the white employees of the production unit were adversely affected by racial discrimination on the part of Allied or the union and thus are members of the class.

It seems equally clear that those black employees who were signatories to the October 18, 1971 EEOC conciliation agreement cannot be considered as members of the class in the present case. This Court has already determined that a signatory of the EEOC agreement could not intervene as a party to this suit since EEOC has retained jurisdiction to supervise the carrying out of that agreement. Part II(f) of the conciliation agreement provides:

"The Charging Parties hereby waive, release, and covenant not to sue Respondent Company and/or Respondent Union with respect to any matters which were or might have been alleged as charges filed with the Equal Employment Opportunity Commission, subject to performance by the Respondents of the promises and representations contained herein. The Commission shall determine whether the Respondents have complied with the terms of this Agreement."

In its minute entry of December 12, 1973, dismissing the complaints of intervenors Henry Clark, Jr. and Anthony White, this Court stated:

"The gist of the intervenors' position is that they entered into the EEOC agreement without proper legal advice and that they were not advised at the time of available alternate procedures. We do not believe that this is sufficient grounds for the intervenors to ignore the EEOC agreement and attempt to pursue this litigation. If they have these complaints, they may present them to the EEOC which has retained jurisdiction over the operation of the conciliation agreement, and they may, of course, receive relief from the EEOC if their claims are justified. The very purpose of the conciliation agreement was to avoid litigation insofar as all parties thereto were concerned. To permit these intervenors to come into this suit would be to ignore completely the conciliation agreement and would be to disregard completely the attempts of the EEOC to settle these matters without the necessity of litigation, which was the very purpose of the establishment of the EEOC in the first place."

■ Since these individuals cannot join as parties it follows that they should not be the basis for a class action. To hold otherwise would have the effect of undermining the EEOC settle-

ment. This is not to say that the signing parties could not be the beneficiaries of any class action which is properly brought. But to allow them to be the sole foundation of such an action would be completely unjustified.

At the time the conciliation agreement was entered into there were a total of 42 minority employees working in the Production Unit. Since 36 of these individuals were signing parties to that conciliation agreement, this leaves a remainder of only six employees to be considered as members of plaintiffs' class. Although plaintiffs contend the class consists of former as well as present employees of the Production Unit, it has not introduced a single shred of evidence to show that former employees, other than those laid off since the conciliation agreement, have been adversely affected by discriminatory practices. Therefore, with a possible class of only six individuals, the plaintiffs have failed to meet their burden of proving the class is so numerous that joinder would be impracticable as required by Rule 23(a)(1).

The principal claim asserted by the plaintiffs in this case concerns whether the unit seniority system set out in the collective bargaining agreement between Allied Chemical Corporation and Local 216 and the "layoff" provisions contained therein violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 2000e-2(a) provides:

"It shall be unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges · of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Similar prohibitions with respect to labor unions are set out in 42 U.S.C. § 2000e-2(c).

The plaintiffs in this case do not contend that defendants are actively discriminating against black employees of Allied Chemical at the present time, but rather that the effects of past discrimination were carried forward and were still in existence at the time of their layoff because of the seniority and layoff provisions contained in the collective bargaining agreement. Therefore, it is the present discriminatory effects of the prior racial exclusion of negroes from certain job units that the plaintiffs contend is the violation of Title VII. In support of this contention, plaintiffs rely on a long line of recent cases which hold that where a seniority system carries forward and perpetuates the effects of past discrimination into the present, such a system is a continuing violation of Title VII unless it is justified by a legitimate, non-discriminatory business necessity.

The Fifth Circuit case which first considered this problem was Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (CA 5—1969). In that case the Court found the facts to be as follows. Prior to 1964 the Company, Crown Zellerbach at Bogalusa, Louisiana, divided jobs into two seniority lines, a black line and a white line, with the job benefits in the black line being much less desirable than those in the white line. In 1964 the lines were merged. However, because of the lower pay scale in the black line, it was in effect merely tacked to the bottom of the white line. Promotions were determined by the amount of job seniority in the position below the vacant job.

The Court held that Crown Zellerbach's job seniority system which was in effect at its Bogalusa Paper Mill violated Title VII "because by carry-

ing forward the effects of former discrimination practices the system results in present and future discrimination. When a negro applicant has the qualifications to handle a particular job, the act requires that negro seniority be equated with white seniority." The Court pointed out that:

"It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the *past* is to cut into the employees *present* right not to be discriminated against on the ground of race." 416 F.2d at 988.

After it determined that there still remained present effects of past discrimination, the problem then before the Court was how far must an employer go to remedy the discriminatory effect. The Court considered three possible theories for handling the problem:

"The crux of the problem is how far the employer must go to undo the effects of past discrimination. A complete purge of the 'but-for' effects of previous bias would require that Negroes displace white incumbents who hold jobs that, but for discrimination, the Negroes' greater mill seniority would entitle them to hold. Under this *'freedom now'* theory, allowing junior whites to continue in their jobs constitutes and act of discrimination.

"Crown and Local 189 advance a 'status quo' theory: the employer may satisfy the requirements of the Act merely by ending explicit racial discrimination. Under that theory, whatever unfortunate effects there might be in future bidding by Negroes luckless enough to have been hired before desegregation would be considered merely as an incident of now extinguished discrimination.

"A *'rightful place'* theory stands between a complete purge of 'but-for' effects [and] maintenance of the status quo. The Act should be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation."

After adopting the "rightful place" theory the Court then recognized that there are certain times as a matter of practicality and "business necessity" when it cannot be applied.

"Not all 'but-for' consequences of pre-Act racial classification warrant relief under Title VII. For example, unquestionably Negroes, as a class, educated at all-Negro schools in certain communities have been denied skills available to their white contemporaries. That fact would not, however, prevent employers from requiring that applicants for secretarial positions know how to type, even though this requirement might prevent Negroes from becoming secretaries." At p. 988.

And,

"When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose. Secretaries must be able to type. There is no way around that necessity." At p. 989.

Therefore, it is clear from this case that a District Court has the power to eliminate the present effects of past discrimination by altering a seniority system which is apparently racially neutral on its face, unless the doctrine of business necessity is applicable. The present effects of past discrimination interpretation of Title VII has since been reaffirmed and applied many times. See Johnson v. Goodyear Tire & Rubber

Co., Synthetic Rubber Plant, 491 F.2d 1364 (CA 5—1974); Bing v. Roadway Express, Inc., 485 F.2d 441 (CA 5—1973); United States v. Georgia Power Company, 474 F.2d 906 (CA 5—1973); United States v. Hayes International Corporation, 456 F.2d 112 (CA 5—1972); Bing v. Roadway Express, Inc., 444 F.2d 687 (CA 5—1971); Robinson v. Lorillard Corporation, 444 F.2d 791 (CA 4—1971); Watkins v. United Steel Workers of America, Loc. No. 2369, 369 F.Supp. 1221 (E.D.La.—1974). See also Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.—1968).

None of the Title VII cases have ever held that the unit or departmental seniority system is per se a violation of the Civil Rights Act. In fact, in every case where it was questioned the courts have allowed the company to maintain separate departments, with their separate seniority systems, when the jobs or functions to be performed are not directly related to each other. The courts simply applied the rightful place formula to the existing departments. This is primarily what the EEOC conciliation agreement did in the instant case. Although there was a merger of the Services and Production Units, the other two units maintain their separate identity. The agreement requires something very similar to the "rightful place" formula in favor of negroes seeking transfers and advancements. Section IX of the agreement states:

"IX. AFFECTED CLASS AND
SENIORITY"

"A. The Respondents agree that members of the 'Affected Class' shall be those Negro employees previously identified by the Respondent Company as making up the 'Affected Class'. This included those Negro employees working in the predominantly Negro Job Classifications of Baggers, Truck Driver, Leader, Janitor and Laborer, who were hired into these classifications on or before May 2, 1969. A list of such 'Affected Class' employees, by name, department, job, and date of initial hired, is attached hereto as Exhibit No. 1.

"B. The Respondent Company agrees that it will give priority to members of the 'Affected Class' in filling all job vacancies in accordance with Article 9, Section 7, of the current Labor Agreement. Whenever a vacancy exists, the Respondent Company will review the qualifications of 'Affected Class' members and identify those individuals qualified to fill the vacancy. The most senior qualified bidder shall be awarded the job. A qualified individual shall be defined as possessing minimal qualifications or aptitude necessary to perform the job.

"C. All members of the 'Affected Class' who transfer between units shall be credited with *total plant seniority* for purposes of that transfer, promotion, *layoff*, vacations, or recall. (Emphasis added.)

"D. The Respondent Company and Respondent Union represent that a special seniority agreement covering all employees has been negotiated. This new 'Supplemental Agreement' provides that when employees transfer from one unit to another unit or within a unit, they will carry their total plant seniority with them into their new unit or job, as outlined in the Supplemental Agreement. A copy hereto attached and made a part of this Agreement as Exhibit 2."

This preference to "Affected Class" employees in transfers and promotions is also supported by a special provision in the current October 15, 1973, collective bargaining agreement. The "Spe-

cial Provisions" section of this agreement states:

### "SPECIAL PROVISIONS"

"A. The 'Affected Class' is hereby defined as all Negro employees who were hired on or before May 2, 1969.

"B. In any job opening which results in a transfer from one seniority unit to another or within a seniority unit, when one or more of the competing employees is a member of the 'Affected Class' the members of the 'Affected Class' will compete with other employees on the basis of his plant seniority, providing that he has successfully completed the one-year residency provision.

"C. When any member of the 'Affected Class' is competing with other employees in bidding for a senior operator's job in the Production Unit, the 'Affected Class' employee will not be allowed to utilize his plant seniority until he has completed the progression as an A Operator as stipulated in Appendix I of the current agreement."

It seems quite clear that the formulas set out in these provisions of the agreement are in complete compliance with Title VII as they relate to promotions and transfers.

However, the question of whether or not the layoff provisions in the pre or post October, 1971 collective bargaining agreements are in violation of the Act is another matter. While there is a dearth of cases dealing with this problem, the case of Watkins v. United Steel Workers of America, Loc. No. 2369, 369 F.Supp. 1221 (E.D.La.—1974) did address itself to lay-offs and seniority systems. In *Watkins* the plaintiffs and plaintiff intervenor were all former employees who had been laid off under the lay-off and recall procedures utilized by the defendant union and company. The evidence in that case showed that although the defendant company's plant had been in operation for "many years," it had only hired whites up until 1965, with the exception of two negroes who were hired during World War II. After 1965 the company began hiring blacks to the extent that by 1971 there were over 50 blacks in a total work force of 400. Beginning in 1971 there was a substantial cutback in personnel. Pursuant to the terms of the collective bargaining agreement in effect between the defendants, layoffs were made on the basis of "total employment seniority," with the last man to be hired being the first to be laid off. As a result of the application of these contract provisions, all of the black employees hired after 1965 had been laid off and the work force was again composed solely of white employees. In addition, the first 138 persons on the recall list were white.

The Court in *Watkins* granted the plaintiffs' and plaintiff-intervenor's motion for Partial Summary Judgment and held that under the facts of that case "the defendants' layoff and recall practices discriminate on grounds of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2, and in violation of Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981." The Court set out the primary issue in the case as follows:

"Essentially, it is movants' argument that it was racially discriminatory to use length of service as a standard for determining which employees should be laid off because blacks were prevented, by the Company's white-only hiring policy, from acquiring long years of service. (Footnote omitted.) Movants ask that the defendants be required to select employees for layoff on a basis that does not incorporate and perpetuate the effects of the Company's racial discrimination in hiring." 369 F.Supp. 1221 at 1224.

In agreeing with the moving parties' argument, the Court in its reasoning points out that it "draws strong support from two lines of related cases." These series of cases are: 1) those dealing

with transfers or promotions on the basis of departmental seniority in those plants that had previously segregated work forces, like in Local 189 v. United States, supra, and 2) those cases concerning work referral rules in previously all-white craft unions. The Court stated that these two lines of cases show a single principle:

"[E]mployment preferences cannot be allocated on the basis of length of service or seniority, where blacks were, by virtue of prior discrimination, prevented from accumulating relevant seniority. And this principle applies to invalidate the layoff and recall rules in the case at bar. The Company's history of racial discrimination in hiring makes it impossible now for blacks (other than the original two) to have sufficient seniority to withstand layoff. In this situation, the selection of employees for layoff on the basis of seniority unlawfully perpetuates the effects of past discrimination." (Emphasis added.) 369 F.Supp. 1221 at 1226.

Although this appears to be a proper interpretation of those cases, it is doubtful that the Court in *Watkins* properly applied those principles to the facts of that case. The Court did not require a showing that the individual blacks were prevented from acquiring the necessary seniority "by virtue of" prior discrimination, but instead imposed an absolute quota system on the plant. At page 1231 the Court states:

"Similarly, in this case, the relief ordered by the Court will not be designed to compensate the blacks who were not hired by the Company between 1945 and 1965. It will be designed to insure that, because the Company hired no blacks for twenty years, the plant will not operate without black employees for the next decade. The beneficiaries of the order will be the blacks who will now work at the Harvey plant, but who would otherwise have been excluded because of the structure built upon the prior discrimination."

Although the Court cited several cases, including United States v. Lathers, Local 46, 471 F.2d 408 (CA 2–1973), which appear to support this sort of quota system for the purpose of enjoining the continued effects of past discrimination, such a remedy flies into the teeth of 42 U.S.C. § 2000e–2(j) and the "rightful place" doctrine. 42 U.S.C. § 2000e–2(j) provides, in pertinent part, that:

"Nothing contained in this subchapter shall be interpreted to require any employer * * * labor organization * * * to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer * * * admitted to membership or classified by any labor organization * * * in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

Section 2000e–2(j) clearly shows that the Civil Rights Act was not designed to require an employer to remedy prior racial discrimination by granting "preferential treatment" in the form of a quota system to those minority individuals who have not themselves suffered the effects of discrimination. In addition, under the "rightful place" theory, blacks are assured of "the first opportunity to move into the next vacancies in positions which they would have occupied *but for wrongful discrimination* and which they are qualified to fill." (Emphasis added.) United States v. Georgia Power Company, 474 F.2d 906 (CA 5–1973). The doctrine requires some sort of "but for" causal relationship between the discriminatory effects and the particular individual or class of individuals. For example, in

Bing v. Roadway Express, Inc., 485 F.2d 441 (CA 5–1973), the Court stated that the "rightful place" theory should be applied in the following manner:

"A complete decree must give enough relief to insure that the transferred discriminatees are able to *maintain* their rightful place. Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement *he would have enjoyed,* and to give him the protection against layoffs *he would have had,* in the absence of discrimination. How much seniority the transferee deserves should be determined by the date he would have transferred but for his employer's discrimination." (Emphasis added.)

In this case the plaintiffs' claim, boiled down, is that because division of the plant into separate unit seniority lines had the effect of continuing prior exclusion of blacks from obtaining jobs in the Maintenance and Stores Units, they were locked into the Production Unit. Therefore, when Lloyd Hinton was laid off and Luttrell Cox's job was reduced, because of a cutback in the Production Unit, they should have been allowed to use their total plant seniority to protect them from layoff or reduction as long as there were white employees in the Maintenance and Stores Units with less plant seniority.

There is some merit to plaintiffs' argument. As was stated in Johnson v. Goodyear Tire & Rubber Co., supra:

"Once it has been determined that blacks have been discriminatorily assigned to a particular department within a plant, departmental seniority cannot be utilized to freeze those black employees into a discriminatory caste."

It would seem equally logical to conclude that once a black has been discriminatorily assigned to a particular unit and has been locked into that unit because of a unit seniority system that prevents transfer, unit seniority should not be utilized to lay him off prior to an employee in another unit with less total plant seniority. This, of course, is only true if the individual being discriminated against was qualified to perform the jobs in the all-white units. Also this principle should only apply if the minority employee would have transferred but was prevented from doing so because of a system that continued the effects of past discrimination. Therefore, it must be shown that the qualified black employee would have transferred into a vacant position "but for" a racially discriminatory system. In other words, the discrimination must be the cause of plaintiffs' injury.

In this case Luttrell Cox and Lloyd Hinton were substantially inhibited from transfer into the all-white units by the collective bargaining agreements in effect at the Allied Plastic Division plant prior to October of 1971. The October, 1970 collective bargaining agreement (Joint Exhibit 2) provides that:

"At such time as a transfer or promotion from one seniority unit to another results in a change in an employee's regular job classification, he shall accumulate seniority in his new Unit, retroactive to the date of the transfer or promotion, and his seniority in his former Unit shall be forfeited."

(A similar provision is contained in the December 15, 1967 collective bargaining agreement.) Although it has not been proved that such a result was actively desired by the defendants, in effect, the racial exclusion of blacks from the Maintenance and Stores Units was perpetuated by the above transfer clause. Therefore, prior to 1971, this provision had the effect of perpetuating past racial discrimination. With this established, the only remaining question for this Court to determine is whether these plaintiffs would have transferred into

the numerous vacancies which became available in the Maintenance Unit during their employment at Allied and, if so, did they have sufficient qualifications to fill them. If this is established, under the principles as set out above, their unit seniority should not have been used to lay them off prior to employees in the other units with less total plant seniority.

The evidence in this case shows that in all probability these parties would have transferred into the Maintenance Unit but were prevented from doing so because of the seniority system in effect at the Allied Plastics Division plant. The testimony of Lloyd Hinton shows that prior to his employment at Allied his interest and training were in basically maintenance related fields. While in the United States Army, he attended United States Army Air Conditioning and Maintenance Missile School, Air Defense Missile Repairman School, Maintenance Management and Supply Operator School, and Aviation Air Conditioning School. In addition to this training, while in the Army, he operated and maintained Diesel power generators. After being discharged from the Army he worked as an air conditioning and refrigerator mechanic at H & H Refrigeration. Presently he is a licensed television repairman and owns and operates his own repair shop in the City of Baton Rouge. From this it must be concluded that, had he had the opportunity, Lloyd Hinton would have transferred into the Maintenance Unit and that he was qualified to do so.

The same conclusion must be drawn in the case of Luttrell B. Cox. While in the United States Army he completed a course in Diesel Mechanics and Heavy Equipment. Thereafter he worked in the Army as a mechanic for three years. These qualifications appear to be comparable to those of a substantial number of employees hired into the Maintenance Unit during his employment with Allied Chemical.

It is therefore the opinion of the Court that these two plaintiffs are entitled to the appropriate relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

As to Sherwood Cox, a white employee presently working in the Production Unit, there is no evidence that he has been adversely affected by any racial discrimination. Although he did not take the witness stand, in his deposition taken on April 24, 1972 (Defendants' Exhibit 1), Mr. Cox testified that he was employed at the Allied plant as an A Operator, which is one of the better jobs in the Production Unit. He did not testify as to any injury that he has sustained by the seniority system in effect. He does not in any way indicate that he wants to work in the Maintenance Unit. He merely states that the seniority system injures him because he is "imminently faced with a layoff in the foreseeable future whereas members in the maintenance department are being retained * * * in their employment with up to probably half of the seniority that he has." However, as pointed out above, the unit seniority system, and its necessary effects, are not per se wrong. In addition, there is no indication that Sherwood Cox was qualified to work in the Maintenance Unit. Although he stated that he had done some general automobile mechanic work and repairing of washing machines, this is not supported by his record of employment contained in Joint Exhibit 15a or by any other evidence. Furthermore, in his deposition, he stated that he did not feel that he was qualified at the present time to fill a position in the Maintenance Unit as a Machinist, an Instrument Technician, an Electrician, or a Welder. For these reasons, Sherwood Cox is not entitled to the relief he seeks under Title VII of the Civil Rights Act.

As for remedies, this Court, under 42 U.S.C. § 2000e–5(g), is authorized to:

"* · * * order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. * * * "

Although reinstatement is authorized, this Court would be reluctant to grant such relief if it required the removal of incumbent employees. In addition, the evidence concerning the two prevailing plaintiffs' actual losses in back pay is somewhat sketchy. Plaintiffs have suggested that should they prevail, the parties should be directed to confer as to the possibility of agreeing on appropriate relief to be granted, and failing to agree, the Court should hear further evidence on that issue. The Court agrees with that suggestion and will so order.

■ Both Allied Chemical Company and Local 216 should be equally liable for any back pay entitlements. Under the facts of this case "it would be difficult to fasten liability on one party to the labor contract which was a substantial cause of the discriminatory employment practices and grant total immunity from such liability to the other party." Johnson v. Goodyear Tire & Rubber Co., supra.

In addition, pursuant to 42 U.S.C. § 2000e–5(k), the "court, in its discretion, may allow the prevailing party, * * * a reasonable attorney's fee as part of the costs," which in this case should be allowed in favor of the attorney for Luttrell Cox and Lloyd Hinton. In the event the parties cannot agree on this item of costs, the Court will hear further evidence on that issue also.

Judgment will be entered in accordance herewith.