**SCHAEFER et al., Plaintiffs,**

**v.**

**TANNIAN et al., Defendants.**

**Civ. A. No. 39943.**

United States District Court,
E. D. Michigan, S. D.

May 13, 1975.

John R. Runyan, Jr., Wayne State Univ. Clinical Law Program in Employment Discrimination, Detroit, Mich., for plaintiffs.

Kermit G. Bailer, Corp. Counsel, William B. Beach, Asst. Corp. Counsel, Detroit, Mich., for defendants Philip G. Tannian, Ind. and as Commissioner of the Detroit Police Dept. Richard Coretti; Director of Recruiting; and Coleman Young, Mayor of City of Detroit, Armand D. Bove, Grosse Pointe Woods, Mich., for defendant Detroit Police Lieutenants & Sergeants Ass'n.

James M. Moore, Detroit, Mich., for defendant Detroit Police Officers Ass'n.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This class action was commenced on April 10, 1973. The plaintiffs represent a class, as certified by this Court, composed of all women who have been employed, are employed, might be employed or are applicants for employment with the Detroit Police Department (DPD) since April 10, 1970. As originally filed, the defendants were the principal officials of the City of Detroit charged with the operation of the DPD and with responsibility for its hiring, assignment and promotion practices. The complaint charged these defendants with discrimination on the basis of sex in recruiting, examining, hiring, promoting and compensating employees and potential employees of the DPD in violation of 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1983.

On April 30, 1975, a hearing was held on the plaintiffs' motion for a preliminary injunction. They sought to enjoin the defendants from laying off or demoting any female police officers, sergeants or lieutenants (who had been hired or promoted pursuant to this Court's preliminary injunctions of May 13 and June 7, 1974). These layoffs and demotions were scheduled as a result of budgetary deficits experienced by the City of Detroit. The persons scheduled for layoff and demotion were selected according to the provisions contained in collective bargaining agreements between the City of Detroit and the Detroit Police Officers Association (DPOA) and the Detroit Police Lieutenants' and Sergeants' Association (DPLSA). Pursuant to a motion filed by the defendant city officials, and without objection, the DPOA and DPLSA were added as defendants. The DPOA is the exclusive bargaining agent for all police officers below the rank of sergeant and the DPLSA is the exclusive bargaining agent for all lieutenants and sergeants in the DPD. Representatives of the DPOA and DPLSA participated in the April 30 hearing.

At the hearing, testimony was presented and oral arguments were heard, after which the Court determined that preliminary injunctive relief was appropriate. This opinion is intended to supplement the findings of fact and conclusions of law orally entered from the bench after the hearing.

The issues confronted by the Court by this motion for a preliminary injunction must be analyzed in the context of the prior action taken by the Court in this case. On May 13, 1974, a hearing was held on the plaintiffs' motion for partial summary judgment and for a preliminary injunction. This motion was granted. The Court found that the hiring and assignment practices of the DPD illegally discriminated against the plaintiffs on the basis of sex and a preliminary injunction was issued which called for specific affirmative action to eliminate

this discrimination, including the increased hiring of women.[1]

On June 7, 1974, a hearing was held on the plaintiffs' second motion for partial summary judgment and for a preliminary injunction. This second motion challenged the practices of the DPD with regard to promotions. This motion was also granted, the Court finding that the promotion practices of the DPD discriminated against the plaintiffs on the basis of sex. A second preliminary injunction was issued, ordering specific affirmative action to eliminate this discrimination.[2]

The two preliminary injunctions were subsequently modified so as to include a reporting requirement. See "Order Modifying Preliminary Injunctions of May 13 and June 7, 1974" entered on January 8, 1975.

As far as this Court is aware, the defendants have faithfully followed these orders (at least until the time the proposed layoffs were announced). Approximately 100 women have been hired by the DPD since December 1, 1974, pursuant to the May 13, 1974 order; and 17 women have been promoted to sergeant and 1 promoted to lieutenant pursuant to the June 7, 1974 order. The record is clear that all of these women would be affected by the proposed layoffs and demotions: The 100 women hired would be laid off and the 18 women promoted would be demoted. It is apparently the plaintiffs' contention that this action by the DPD would violate the spirit, if not the letter, of the preliminary injunction. But they further contend that, given the finding of past discrimination, the layoffs and demotions of these women based strictly on seniority would perpetuate the present effects of past discrimination and would thus be a violation of 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1983.

It is undisputed that the police officers scheduled for layoff and demotion were selected strictly according to the provisions of the collective bargaining agreements. The relevant provisions of the DPOA agreement of June 26, 1973 reads as follows:

## XIII. SENIORITY

A. *Seniority Defined*:

Seniority is defined as service with the Police Department of the City of Detroit as a sworn Detroit police officer.

\* \* \* \* \*

D. *Layoff and Recall*

A layoff is the separation of an employee from the department for lack of work or lack of funds or for reasons other than the acts or delinquencies of the employee. In the event of a reduction in force in the department affected bargaining unit employees will be laid off according to departmental seniority in the following order: (Least Seniority first)

1. Bargaining unit employees who have probationary status.

2. Employees who are non-probationary bargaining unit employees.

\* \* \* \* \*

Employees will be recalled to work as vacancies arise in the following order using seniority as the rule. (Most Seniority first)

1. Employees who are non-probationary bargaining unit employees.

2. Bargaining unit employees who have probationary status.

In other words, the DPOA agreement provides for layoffs according to seniority on a "last hired, first fired" basis.

1. The specific discriminatory practices found by the Court and the affirmative action ordered will be more fully set forth below. See also "Preliminary Injunction" issued May 13, 1974; "Memorandum Opinion" filed May 22, 1974, D.C., 394 F.Supp. 1128; and "Order on Partial Summary Judgment" entered June 18, 1974.

2. The specific discriminatory practices found and the affirmative action ordered will be more fully set forth below. See also "Preliminary Injunction" issued June 7, 1974; and "Order on Second Partial Summary Judgment" entered July 23, 1974.

The relevant provisions of the DPLSA agreement of November 20, 1974 read as follows:

15. ASSIGNMENTS, TRANSFERS AND LAY OFFS

\* \* \* \* \*

C. In the event of a reduction in force in the Police Department it shall be made among all employees in the same class according to length of service. The employee with the lowest length of service shall be the first laid off and the last to re (sic) recalled. If there is to be a demotion due to a reduction in force, time in rank will prevail. A demotion shall be allowed before a lay off, provided the employee requesting a demotion had prior time in the classification to which he is requesting demotion. Any officer demoted due to a reduction in force shall be promoted back in the reverse order of demotion.

D. Seniority shall be determined first by the employee's rank, date of rank, and finally by the employee's length of service in the department as defined in Article III. Time spent in the armed forces on military leaves of absence and other authorized leaves, such as time lost because of duty-connected disabilities, shall be included.

In other words, when demotions in rank are necessitated, those with the least time in the particular rank are demoted first. Total length of service with the DPD is considered only in the event some, but not all, officers with equal time in rank must be demoted.

There is no question but that these provisions are neutral on their face. However, it is also clear that were the proposed layoffs in this case carried out, a disproportionately heavy burden would fall on women; and this result would be caused by the past discriminatory practices of the DPD which prevented women from obtaining enough seniority to withstand the layoffs and demotions. This conclusion is adequately supported by the record of this case.

With regard to the hiring practices, this court has previously found the following facts which are some of the facts relevant to the accumulation of seniority: (1) Separate eligibility lists were maintained for male applicants and female applicants; (2) Female applicants were required to be 21 years of age and have two years of college while male applicants were required to be 18 years of age and high school graduates or equivalent; (3) Written entrance examinations for female applicants were given only once a year while the examinations for men were given weekly; and (4) Until 1970 women were only hired into the Women and Children's Section and thus the size of this section determined the number of women to be hired. These differences in treatment of male and female applicants were not found to be rationally related to any business necessity and thus, were discriminatory.

These facts substantially affected not only the number of women hired, but the time at which qualified women would be hired. At the April 30 hearing, a recently hired female police officer, Karen Pioch, testified that she first applied for employment with the DPD in June, 1972 but that she would have applied a few years earlier if she had not needed two years of college. She applied immediately upon obtaining the requisite college credits. She took the written exam in November, 1972 but as she placed only 150th out of about 500, she was not hired since only 100 women were hired. However, her name remained on the eligibility list. She was finally hired December 11, 1974 after this court's preliminary injunction ordered the increased hiring of women. She was among those scheduled to be laid off.

While it is not possible to ascertain exactly when Ms. Pioch would have been hired were it not for the DPD's past discrimination, it is most probable that she would have been hired at a significantly earlier date and hence would have been able to accumulate increased seniority.

The court believes that Ms. Pioch's situation is only an example of that faced by many of the women scheduled to be laid off. This is particularly apparent because this court's May 13, 1974 injunction ordered the administration of written exams to over 1000 women who had previously applied for employment with the DPD but who had not yet been given the entrance exam, and a ratio hiring of those who were qualified.

With respect to the disparate burden that women would carry under the proposed layoffs, the facts indicate that of 825 police officers scheduled to be laid off, 210, or approximately 25%, are women. However, in 1974, women comprised only 2.15% of the DPD work force. While this percentage has increased to 6.1% since the court's injunction, this percentage is no where near 25%.

With regard to past promotional practices as they relate to the proposed demotions, the following facts, previously found by the court, are worth noting: (1) Until December, 1973, separate eligibility lists for male and female police officers were kept; (2) From 1963 to 1974 the number of sergeant positions available for males increased 240% while the number of sergeant positions available for females increased only 30%; and (3) As of June 6, 1974, there was approximately 1 male sergeant for every four male police officers while there was only about 1 female sergeant for every eight female police officers. The court found that the DPD had historically discriminated against women in promotion.

The testimony of Joyce Grames and Virginia Barr at the April 30 hearing underscored the effect that these procedures had on women in being promoted and accumulating time in rank. This testimony need not be detailed since the city defendants stipulated that the past practices impeded the progress of women. Furthermore, the figures amply demonstrate the disproportionate burden carried by women by the proposed demo-

tions. Women sergeants comprise about 10% of the sergeants scheduled to be demoted to patrol officer. In 1974, women comprised approximately 1% of the total number of sergeants.

It is quite clear that should the layoffs and demotions take place as scheduled, the DPD would be back to the same situation with regard to the number of women employed at various levels as it was before this court took steps to halt the discrimination. The question thus presented is whether a seniority system which is neutral on its face nevertheless violates 42 U.S.C. § 2000e et seq. or 42 U.S.C. § 1983 when it results in the perpetuation of the effects of past discrimination. In Griggs v. Duke Power Co., 401 U.S. 424 at pp. 429–430, 91 S.Ct. 849 at p. 853, 28 L.Ed.2d 158 (1971) the Supreme Court stated as follows:

> The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

Furthermore, in Palmer v. General Mills, 513 F.2d 1040 (6th Cir. 1975) [#74–2032], the Sixth Circuit reiterated that "Title VII reaches the 'continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices.'" (p. 1042)

While the *Griggs* Court was specifically referring to race discrimination, it is clear that the same principle applies to sex discrimination since Title VII prohibits discrimination in employment on

the basis of race, color, religion, *sex,* or national origin. See Meadows v. Ford, 510 F.2d 939, (6th Cir. 1975) and Palmer v. General Mills, supra.

However, this does not end the court's present inquiry, for the court must examine this principle in the light of 42 U.S.C. § 2000e–2(h) [§ 703(h) of 1964 Civil Rights Act] which provides, in pertinent part, as follows:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply * * * different terms, conditions, or privileges of employment pursuant to a bona fide seniority * * * system * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin * * *

■ The need to interpret this provision, and, if necessary, reconcile it with the principle stated in *Griggs,* has given rise to several recent cases. These cases have been concerned with the situation where, as in the case at bar, there has been past discrimination in violation of Title VII and where a seniority system, neutral on its face, serves to perpetuate the effects of the past discrimination. Some of the cases have arisen in the context of "departmental" or "job" seniority systems while others have focused on "plant" or "company" seniority systems. Simply stated, "plant" seniority is determined by the total amount of time an employee has worked for the company. "Departmental" seniority is determined by the length of time the employee has worked in a particular job slot within the company. As the two types of seniority system have sometimes received different treatment by the courts, it is appropriate to discuss them separately.

The courts have been almost unanimously agreed that a "departmental" seniority system which perpetuates the effects of past discrimination is a violation of Title VII. Local 189, United

Papermakers and Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969) is frequently cited for this proposition. The employer in this case, Crown Zellerbach, had formerly maintained lines of progression which were segregated by race. Blacks were hired only into one line of jobs; generally the least desirable. "Promotion within each line was determined by 'job seniority'; when a vacancy occurred, the workers below it could bid for the job, and the one who had worked the longest *in the job slot below* had priority." (416 F.2d at 983) In 1966 the collective bargaining agreement was amended so as to merge the progression lines. In effect, the black progression line was tacked to the bottom of the white line. Promotions continued to be awarded on the basis of job (departmental) seniority; total time worked for the company meant nothing. The Fifth Circuit explained the result of this system as follows:

As a necessary result, Negroes had no seniority in bidding for formerly white jobs except as against each other and new white employees. They could not have such seniority, since the Company had not allowed them into the white progression lines. Crown gave no recognition to years spent in the Negro lines, and continued to make years spent in formerly white jobs the determinative factor in awarding all former white jobs except those previously at the entry level. The system conditioned job advancement upon a qualification that the Company itself had limited racially, *regardless of whether the qualification*—seniority in previously white jobs—*was necessary to do the work.* The legality of that arrangement is the main issue here. (416 F. 2d at 984) (Emphasis in original)

It is also important to note that this system permanently placed incumbent blacks lower on the progression ladder than whites who were junior to them in terms of total length of employment. The district court concluded that the system

constituted a violation of Title VII and ordered that in the future, seniority would be determined by total length of service (plant seniority) "in all circumstances in which one or more competing employees is a Negro employee hired prior to January 16, 1966." (416 F.2d at 985) The use of job seniority was allowed whenever the competition did not involve a black hired before January 1966 and the order did not change the system of job-by-job progression. The order specifically disavowed any intention to require the promotion of an unqualified person, regardless of his seniority.

The Fifth Circuit affirmed the district court in all respects and found that the job seniority system was not required by any business necessity. The court stated that the legislative history of Title VII was "singularly uninstructive on seniority rights," (416 F.2d at 987), at least with respect to "departmental" seniority systems. Looking to the language of § 703(h), quoted above, the court agreed with the reasoning in Quarles v. Philip Morris, 279 F.Supp. 505 (E.D.Va.1968) that the crucial phrase of that section was *"bona fide* seniority system," and that one characteristic of such a system was lack of discrimination. As the departmental seniority system utilized by Crown Zellerbach was found to constitute a form of present racial discrimination, the court concluded that the system was not bona fide and thus, not protected by § 703(h).

As stated above, the opinion of the Fifth Circuit in the *Local 189* case has been generally accepted by other courts. Thus, in support of this court's decision to follow that opinion with regard to "departmental" seniority systems which perpetuate the effects of past discrimination, this court will only cite the Sixth Circuit cases of EEOC v. Detroit Edison, 515 F.2d 301 (6th Cir. 1975) and Palmer v. Mills, 513 F.2d 1040 (6th Cir. 1975) [#74–2032]. In the Detroit Edison case, the Sixth Circuit made the following remarks:

This court is committed to the "rightful place" theory of seniority enunciated by the Fifth Circuit in United Papermakers & Paperworkers v. United States (Citation omitted) * * * The district court properly directed that plant-wide seniority be accorded all black employees of Edison * * * Departmental or job seniority rooted in racial discrimination is not bona fide seniority. * * *

 This court believes that the system whereby the persons scheduled for demotion were selected pursuant to the DPLSA collective bargaining agreement falls within this line of cases concerned with departmental seniority systems. Although the case at bar is concerned with demotions rather than promotions, the court believes that the same principles apply. Although, strictly speaking, the women were not promoted on a departmental seniority basis, this is the basis on which they would be demoted. And, analogous to the *Local 189* case, the demotions would result in the demotion of women more senior in terms of total length of service than the men who retain their positions. As already noted earlier in this opinion; this result stems directly from the past discrimination, only recently terminated, when men and women were divided into separate lines of progression in which the women's chances for promotion were substantially less than the men's chances. When the two lines were merged, the women, by virtue of the past discrimination, had already been denied the one qualification which would have enabled them to withstand the planned demotions —time in rank. Thus, the court believes that the plaintiffs have shown a probability of success on the merits and that the seniority system whereby persons were selected for demotion is not a bona fide seniority system covered by § 703(h) because it perpetuates the effects of past discrimination and therefore, is itself, discriminatory and a violation of Title VII. Mention should also be made of

the fact that no attempt was made to justify this seniority system on the basis of "business necessity."

The layoffs which are scheduled pursuant to the DPOA seniority system of "last hired—first fired" is a "company" or "plant" seniority system and was not directly involved in the cases dealing with "departmental" seniority. However, there are cases which have confronted the issue of the legality of these systems when they perpetuate the effects of past discrimination. There is no unanimity on this issue.

In the *Local 189* case, supra, the Fifth Circuit was confronted with a "departmental" seniority system. However, the case contains some discussion relevant to "company" seniority systems wherein the court distinguished the impact of Title VII, and more particularly § 703 (h), on the two types of seniority systems. This dicta has been quoted by at least two other courts in support of their position that a "company" seniority system which is facially neutral does not violate Title VII even though it serves to perpetuate the effects of past discrimination. This dicta, based on the legislative history of Title VII, reads, in part, as follows:

> No doubt, Congress, to prevent "reverse discrimination" meant to protect certain seniority rights that could not have existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but after his original rejection, even though the Negro might have had senior status but for the past discrimination. * * * It is one thing for legislation to require the creation of *fictional* seniority for newly hired Negroes, and quite another for it to require that time actually *worked* in Negro jobs be given equal status with time worked in white jobs. * * * [F]ictional

seniority for new Negro employees would not necessarily aid the actual victims of the previous discrimination. (416 F.2d at 994, 995)

One of the cases which directly confronted the issue now before this court and found no violation of Title VII is Waters v. Wisconsin Steel Works, 502 F.2d 1309 (7th Cir. 1974). Before the court was a contention by an employee that his employer had previously practiced racial discrimination and that the "last hired, first fired" seniority system which resulted in his being laid off violated Title VII since it perpetuated the effects of past discrimination. The Seventh Circuit agreed that there had been past racial discrimination but, based on its interpretation of the legislative history of Title VII, held that the seniority system was bona fide:

> We are of the view that Wisconsin Steel's employment seniority system embodying the "last hired, first fired" principle of seniority is not of itself racially discriminatory or (sic) does it have the effect of perpetuating prior racial discrimination in violation of the strictures of Title VII. To that end we find the legislative history of Title VII supportive of the claim that an employment seniority system is a "bona fide" seniority system under the Act.
> (502 F.2d at 1318)

The court then discussed the legislative history on which it almost exclusively relied and distinguished "departmental" seniority systems from the one utilized by the defendant company. However, the following language of the Seventh Circuit is worth noting:

> We are not, however, insensitive to the plaintiffs' argument, and think employers should be discrete in devising an employment seniority system. We recognize that it is a fine line we draw between plaintiffs' claim of discrimination and defendants' countercharge of reverse discrimination. On balance, we think Wisconsin Steel's

seniority system is racially neutral and does not perpetuate the discrimination of the past.
(502 F.2d at 1320)

Additionally, in ruling an another aspect of the case, the Seventh Circuit found racial discrimination "[i]n light of Wisconsin Steel's past history of racially discriminatory hiring practices and the racially neutral yet potentially discriminatory impact of the employment seniority system utilized by the company. . ." (502 F.2d at 1320).

In Jersey Central Power & Light Co. v. International Brotherhood of Electrical Workers, 508 F.2d 687 (3rd Cir. 1975), the Third Circuit was not directly confronted with a Title VII attack but in the course of its opinion it addressed the issue raised in the case at bar. The actual question before the court was whether a collective bargaining agreement layoff seniority provision was in conflict with an EEOC conciliation agreement calling for the increased hiring of minority groups and females. After finding no such conflict, the court turned to the question of whether public policy considerations mandated a modification of the "last hired, first fired" seniority provisions which had a disproportionate impact on minorities and women. The court held that a *per se* violation of Title VII did not occur when females and minority group persons were disadvantaged by reverse seniority layoffs. It then turned to the question of whether evidence of past discrimination against these groups would change this so as to permit judicial modification of the seniority system. This latter question was addressed for the guidance of the district court to whom the case was remanded. The court held that such evidence would not be probative.

While the court heavily relied on its interpretation of the legislative history of Title VII (which history this court will discuss *infra*) to support its conclu-

sion that evidence of past discrimination was not probative and would not call for modification of the seniority system, the Third Circuit started with a premise with which this court cannot agree. The court made the following statements:

As we explain below, proofs of this nature are without probative value in challenging a bona fide seniority system. We believe that Congress intended to bar proof of the "perpetuating" effect of a plant-wide seniority system as it regarded such systems as "bona fide". Congress, while recognizing that a bona fide seniority system might well perpetuate past discriminatory practices, nevertheless chose between upsetting all collective bargaining agreements with such provisions and permitting them despite the perpetuating effect that they might have. We believe that Congress intended a plant-wide seniority system, facially neutral but having a disproportionate impact on female and minority group workers, to be a bona fide seniority system within the meaning of § 703(h) of the Act.

To effectuate this intent, the only evidence probative in a challenge to a plant-wide seniority system would be evidence directed to its *bona fide* character; that is, evidence directed either to the neutrality of the seniority system or evidence directed to ascertaining an intent or design to disguise discrimination. As such, it is not fatal that the seniority system continues the effect of past discrimination. We believe this result was recognized and left undisturbed by Congress in its enactment of § 703(h) and (j).
(508 F.2d at 706, 707)

It seems to this court that the Third Circuit started with the premise that were it to hold that the seniority system was not bona fide, it would be saying that *all* "last hired, first fired"

seniority systems were not bona fide if they had a disproportionate effect on minorities and women, *regardless* of whether there had been past discrimination against these groups. At p. 708, the court stated that its interpretation of the legislative history was that "Congress did not intend the chaotic consequences that would result from declaring unlawful all seniority systems which may disadvantage females and minority group persons." In this court's opinion, the Third Circuit put the cart before the horse in holding that the seniority system was bona fide without regard to past discrimination. This approach is contrary to that taken by the courts which have held that certain "departmental" seniority systems were not bona fide. In the *Local 189* case, the Fifth Circuit stated that one characteristic of a bona fide seniority system was lack of discrimination. It found this characteristic lacking in the case before it, not because there was a disguised intent to discriminate or because the system was not neutral, but because it perpetuated the effects of *past discrimination.*

It is also important to note that one member of the Third Circuit panel disagreed with the majority's conclusion that evidence of past discrimination would not be probative. In fact, Judge Van Dusen disagreed with the interpretation given to the legislative history by his brethren on the Third Circuit and by the courts in the *Local 189* and *Waters* cases and stated at p. 712:

I find persuasive the writers who contend that the legislative history indicates that Congress, in enacting Title VII, did not intend to preclude remedies altering plant seniority which perpetuates discrimination.

This court is aware, however, that the *Jersey Central Power* case, as well as the *Waters* case and the dicta from the *Local 189* case supports the position taken by the defendants in the case at bar. However, the court is inclined to follow

those cases which have gone the other way. Before discussing the legislative history relied upon by the Fifth, Seventh and Third Circuits, it would be well to take a look at these other cases.

In Watkins v. United Steel Workers, 369 F.Supp. 1221 (E.D.La.1974), the district court thought itself not bound by the dicta contained in the *Local 189* case, a case which was decided by its own circuit court, and held that a "last hired, first fired" seniority system, utilized for layoff and recall, which perpetuated the effects of past discrimination violated Title VII. After examining two related lines of cases—the "departmental" seniority cases and the craft union cases—the court concluded that they shared a single principle which also applied to the case before it: "employment preferences cannot be allocated on the basis of length of service or seniority, where blacks were, by virtue of prior discrimination, prevented from accumulating relevant seniority." (369 F.Supp. at 1226)

The court discussed the legislative history of Title VII and concluded that it was not as probative as the actual language of § 703(h). In fact, the court felt that the "departmental" seniority cases had deviated from some of the language contained in the legislative history.

Furthermore, with regard to the dicta contained in the *Local 189* case, the court made the following remarks:

. . . for several reasons, I have respectfully concluded that these remarks do not represent a judgment of the Court of Appeals on the question before me.

The question involved here was not before the Court of Appeals for decision in *Local 189*. No party argued that plant seniority was unlawful in formerly all-white plants. The Court's remarks were made without the benefit of adversary argument and were a readily available basis on

which to distinguish legislative history that the defendants argued protected racial discrimination. * * * It would certainly be difficult to rationalize an interpretation of the Act whereby companies and unions that maintained segregated plants would be required to alter seniority rules to afford blacks a fair opportunity to compete for formerly all-white jobs, but plants that totally excluded blacks would be permitted to apply seniority rules that foreclosed blacks from that same opportunity.

(369 F.Supp. at 1229)

This case is presently on appeal to the Fifth Circuit but as far as this court is aware, no decision has yet been announced.

Another case out of a Fifth Circuit district court is Delay v. Carling Brewing, 9 EPD ¶ 9877 (N.D.Ga.1974). In that case an employer who had previously practiced racial discrimination utilized a "last hired, first fired" plant seniority system for the purposes of layoff and recall. In response to a motion for summary judgment made by the defendant employer, the court concluded that the Fifth Circuit had never been called upon to decide the exact issue of plant seniority systems which perpetuated the effects of past discrimination and thus, it was not bound to follow the dicta contained in *Local 189*. The court chose to adopt the reasoning of the *Watkins* court. With regard to the legislative history, the court stated:

> Although the legislative history of the 1964 Civil Rights Act has many passages which support the defendant's contentions this legislative history cannot control either the language of the statute as finally enacted nor judicial interpretation of the Act.

The case of Loy v. City of Cleveland, 8 FEP Cases, 615 (N.D. Ohio 1974) presents a fact situation closely analogous to that which is presently before this court. That case, brought by female police officers, concerned the scheduled layoff of police officers due to the City's financial condition. The issue came before the court on the plaintiffs motion for a temporary restraining order. Although the relevant rule of the city Civil Service Commission called for layoffs in inverse order of appointments, this system was somewhat modified. The particulars of that modification are not important.

The court felt that the effect of the layoff system had to be evaluated in light of the prior policies with regard to the hiring of women. The court found that the facts demonstrated a strong likelihood that the city had historically discriminated against women and that the layoffs would result in the removal of a large portion of the already small percentage of female police officers.

In discussing the applicable law, the court stated as follows:

> In general, an employer is permitted under Title VII to use a bona fide seniority system for purposes of employment preference, including layoffs, provided that seniority system is not based upon prior discrimination and does not operate to freeze the effects of past discrimination, (Citations omitted). * * * The courts have ruled that when a group has been prevented by discrimination from obtaining employment in a certain position and therefore from obtaining seniority rights, it should not be further penalized under a seniority system which rewards those who were not the victims of discrimination. (Citations omitted) Furthermore, where past discrimination is established, the courts are endowed with broad authority to remedy the effects of past discrimination with all deliberate speed—including the modification of seniority rights. (Citations omitted).

(8 FEP Cases at 616)

The court concluded that the plaintiffs demonstrated a strong likelihood of success on the merits and concluded that "should plaintiffs succeed at trial in proving that the hiring of 15 women

as patrol officers was a long over-due step toward the non-discriminatory hiring required under the law, this court would be amiss in permitting, one year later, all but 2 of the women to be laid off simply because discrimination had prevented them from earlier securing seniority rights." (8 FEP Cases at 616) It then decided that a temporary restraining order was proper since to delay action would delay the goals of the Civil Rights Act which would, itself, constitute irreparable damage.

In addition to these court decisions, there is also a decision of the Equal Employment Opportunity Commission which supports the plaintiffs' position. This decision was rendered on March 18, 1971 and can be found in 1973 EEOC Decisions ¶ 6217. The district court in the *Watkins* case noted this decision and further remarked that in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court stated that EEOC interpretations of Title VII are entitled to great deference in the courts.

After finding that the employer's "departmental" seniority system was illegal as to those employees who had been hired before the employer's racial discrimination had ceased, the EEOC went on to discuss the entire seniority system's validity vis-a-vis the recently hired blacks. The EEOC stated that some of these recently hired blacks had previously been denied employment for racial reasons and went on as follows:

Thus, except for their color and Respondent's discriminatory practices, these Negroes too would have been employed in the years before 1964, and would presently be accruing seniority. Except for the fact that the first class of discriminatees was subject only to partial discrimination in the years preceding 1964, while the second class was subject to complete discrimination, a distinction which in our view provides no basis for a difference in legal consequence, we can perceive no distinctions between the two classes. (Citation omitted)

As departmental seniority perpetuates past discrimination as to the first class, Respondent's *entire* seniority system perpetuates such discrimination as to the second, by denying those Negroes whose employment was postponed because of Respondent's past discrimination the promotions, including promotions to supervisory status, and overtime which they would otherwise receive. (Citations omitted) We find such seniority system unlawful.

In a footnote to these statements, the EEOC noted its disagreement with the dicta contained in *Local 189* and stated that "(w)e do not believe that the remedial purposes of Title VII would be well effectuated by basing a difference in legal consequence upon the thoroughness of the discrimination. To the contrary, we believe that Title VII *compels* the opposite."

This case, before the EEOC arose in the context of promotions and the Commission expressly reserved decision on the issue of the validity of the seniority system as it affected layoffs.

Much has been said in the above-cited cases about the legislative history of Title VII. It is especially appropriate to make some comment on this history since the *Local 189* dicta and the *Jersey Central Power* and *Waters* holdings relied almost exclusively on those courts' interpretation of the legislative history.

There is no doubt that the Congressional Record contains statements which clearly support the defendants' position. It is these statements upon which the Third, Fifth and Seventh circuits relied. However, these statements were inserted into the Congressional Record by Senators Clark and Case before the

final version of Title VII was passed by the Senate. In this regard it is important to note that it was only this final version which contained any direct reference to seniority systems and had the Senate intended Title VII to mean what Senators Clark and Case thought, it could have said so in more direct terms.

It is also worth noting that when the House debated Title VII prior to the final draft, Representative Dowdy complained that it would require employers who had refused to hire blacks in the past to revise their seniority systems. No one contradicted him. When he proposed an amendment which would have protected these seniority systems, it was voted down.

Although this court recognizes the importance of legislative history, it does not believe that the legislative history involved here is instructive. Rather, the court is inclined to look to the language of the Act itself. For a more complete discussion of the legislative history, see "Seniority and Testing Under Fair Employment Laws," George Cooper and Richard B. Sobol, 82 Harvard Law Review 1598 (1969).

This court is aware of no Sixth Circuit Court of Appeals decision which has directly confronted this issue. However, two recent cases provide some guidance to this court.

Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir. 1975) was a Title VII sex discrimination case challenging the hiring practices of Ford Motor Company. The district court made a finding of discrimination but refused to award back pay or retroactive seniority. The plaintiff appealed from these refusals. Much of the Sixth Circuit's opinion concerned the availability of back pay as a remedy in certain circumstances where the discriminatee could show that she sought employment and that she was eligible for a then existing job. The case was remanded for the district court to make the proper determinations. But the court also discussed the availability of retroactive seniority as a further remedy.

The Sixth Circuit recognized that the award of retroactive job seniority offered greater problems than that of awarding back pay. But the court saw no absolute bar to such relief. This court believes that the statements of the Sixth Circuit merit lengthy quotation:

Seniority is a system of job security calling for reduction of work forces in periods of low production by layoff first of those employees with the most recent dates of hire. It is justified among workers by the concept that the older workers in point of service have earned their retention of jobs by the length of prior services for the particular employer. From the employer's point of view, it is justified by the fact that it means retention of the most experienced and presumably most skilled of the work force. Obviously, the grant of fully retroactive seniority would collide with both of these principles.

In addition, where the burden of retroactive pay falls upon the party which violated the law, the burden of retroactive seniority for determination of layoff would fall directly upon other workers who have themselves had no hand in the wrongdoing found by the District Court.

There is, however, no prohibition to be found in the statute we construe in this case which prohibits retroactive seniority and, of course, the remedy for the wrong of discriminatory refusal to hire lies in the first instance with the District Judge. For his guidance on this issue we observe, however, that a grant of retroactive seniority would not depend solely upon the existence of a record sufficient to justify back pay under the standards of the Back Pay Section of this opinion. The court would, in dealing with job seniority, need also to consider

the interests of the workers who might be displaced as well as the interests of the employer in retaining an experienced work force. *We do not assume, as our brethren in the Fifth Circuit appear to (Local 189, AFL–CIO, CLC v. United States . . .) that such reconciliation is impossible, but as is obvious, we certainly do foresee genuine difficulties.* (Emphasis added) 510 F.2d at 949.

While the Sixth Circuit was not confronted with the precise issue raised in the case at bar, this court believes the *Meadows* case provides support for the position taken in this opinion.

In EEOC v. Detroit Edison, 515 F.2d 301 (6th Cir. 1975) after a finding of racial discrimination, the district court had awarded retroactive seniority to previously rejected black applicants and those blacks to be hired in the future. The Sixth Circuit agreed that Detroit Edison had engaged in racial discrimination but reversed the award of retroactive seniority. Significantly, however, the district court was reversed, not because such an award was not available, but because the class of persons who would receive such seniority were represented by the Government and the Government did not request such relief. The court went on to say:

> There is no conflict between this holding and that of the court in Meadows v. Ford Motor Co. * * * In Meadows, the only named plaintiff was a rejected applicant and the class she represented consisted solely of rejected applicants. Retroactive seniority was part of the relief sought. at 317.

This court believes that probable success on the merits has been demonstrated and that some measure of relief is available and should be accorded to the class of women in this case whose layoffs were mandated in great part because they were not able to accumulate sufficient seniority due to the prior sex discrimination practiced by their employer. The city defendants have made no effort to justify the seniority system because of business necessity. While the DPOA made an assertion that such business necessity existed due to the need to retain the most experienced officers, no such showing was made.

Furthermore, it is important to point out that the women hired pursuant to this court's prior order had all applied for employment with the DPD but because of the discriminatory practices, they had not been timely hired. Additionally, the discriminatory age requirement and two year college requirement undoubtedly had an adverse effect on the earliest date these women could apply.

In its April 30 ruling, this court found that the other prerequisites to the granting of equitable relief were also present in the case at bar.

Because of this disposition under the provisions of Title VII, it is unnecessary for this court to decide whether the same result would be mandated under 42 U.S.C. § 1983. However, it should be noted that, at least in race discrimination cases, some courts believe that the results should be the same under the two provisions. See Watkins v. United Steel Workers, 369 F.Supp. 1221 (E.D. La.1974).

### RELIEF

Although the court concluded on April 30 that preliminary injunctive relief was appropriate, a preliminary injunction was not entered at that time. In order to allow the parties to attempt to agree on specific relief, the court entered only a temporary restraining order prohibiting all layoffs and demotions of female police officers, sergeants and lieutenants until May 9, 1975. On or before that date, the temporary restraining order was to be modified so as to provide specific injunctive relief in the form of a preliminary injunction.

On May 8, the plaintiffs, City defendants and DPLSA submitted individual

proposals on the relief to be included in the preliminary injunction. On May 9 it appeared that the City and the DPLSA were still engaged in fruitful discussion which might have averted the need of any demotions. Thus, at the request of these parties, the court allowed them to continue in their attempt to agree and no preliminary injunction was entered with regard to demotions.

■ However, as no agreement with the DPOA seemed imminent, the court did enter a preliminary injunction after carefully considering the various proposals of the parties. It approached that task with great regard for the public interest and the present seniority system; well aware that to order that some women not be laid off might result in the additional layoffs of men. Fortunately, the court believes that the order it entered did not have this result.

Through the proposals the court was made aware of the fact that may of the police officers scheduled to be laid off were paid substantially through federal funds. Most of these federally funded officers were hired under the Comprehensive Employment and Training Act of 1973 (CETA). These federally funded officers were the most recently hired and their layoffs were mandated, not by the City's budget problems, but because of the seniority provisions encompassed in the DPOA collective bargaining agreement. If these officers, male and female, were not laid off, the City would be obliged to lay off only 550 city-funded officers rather than the 825 officers originally scheduled for layoff. Moreover, approximately three-fifths of these recently hired CETA employees were women and include all of the women hired pursuant to this court's order of May 13, 1974.

Therefore, in order to accord some measure of relief to the victims of past discrimination, but, at the same time, to result in the least detrimental effect on male officers, this court entered an order to the effect that no CETA and other federally funded employees, either male or female, be laid off. The 550 city-funded officers to be laid off were to be selected according to the seniority provisions of the DPOA collective bargaining agreement. The court believes that as a result of this order, (1) fewer total police officers would be laid off; (2) a lesser percentage of women would be laid off; and (3) no officer, male or female, would be laid off who was not originally scheduled for layoff.

Recall was also to be based on seniority as called for by the collective bargaining agreement.

The court was aware that this plan would result in a decreased percentage of female representation in the Police Department; however, the decrease would not be too significant. The court believes that this was the most equitable result. It was the court's understanding that none of the women ordered to be hired pursuant to its prior order would be laid off because they were all hired with federal money.

Additionally, and of great concern to the court, was the result that more senior officers would be laid off while more junior officers, both male and female, would retain their jobs. However, the CETA and other federally funded employees' layoffs were not necessitated by budgetary concerns and only served to increase the total number of officers to be laid off because of the DPOA seniority provisions. According to this court's calculations, no officer would be laid off under this order who would not have been laid off under the original layoff schedule and no male would take the place of a female on the layoff list.

The court believes that the public was also served by this result in that fewer officers would be laid off.